UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| ROGER SLOAN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 2:19-cv-00382-JPH-DLP |
| SAMUEL BYRD, et al. | ) ) ) |
| Defendants. | ) |

**ORDER GRANTING UNOPPOSED MOTIONS FOR SUMMARY JUDGMENT**

Roger Sloan, an inmate at Wabash Valley Correctional Facility, brought this lawsuit alleging deliberate indifference to his serious medical needs. The defendants have moved for summary judgment. Mr. Sloan has not responded to either summary judgment motion, and the time to do so has passed. For the reasons explained below, the unopposed motions for summary judgment are **GRANTED**.

## I. SUMMARY JUDGMENT STANDARD

Parties in a civil dispute may move for summary judgment, which is a way of resolving a case short of a trial. *See* Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any of the material facts, and the moving party is entitled to judgment as a matter of law. *Id.*; *Pack v. Middlebury Com. Schools*, 990 F.3d 1013, 1017 (7th Cir. 2021). A "genuine dispute" exists when a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Material facts" are those that might affect the outcome of the suit. *Id.*

When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inference from it in the light most favorable to the nonmoving party. *Khungar v. Access Community Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). The court is only

required to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it is not required to "scour every inch of the record" for evidence that is potentially relevant. *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 573-74 (7th Cir. 2017).

Mr. Sloan failed to respond to the summary judgment motions. Accordingly, the facts alleged in the motions are "admitted without controversy" so long as support for them exists in the record. *See* S.D. Ind. L.R. 56-1(f); *see* S.D. Ind. L.R. 56-1(b) (party opposing judgment must file response brief and identify disputed facts). "Even where a non-movant fails to respond to a motion for summary judgment, the movant 'still has to show that summary judgment is proper given the undisputed facts.'" *Robinson v. Waterman*, 1 F.4th 480, 483 (7th Cir. 2021) (cleaned up) (quoting *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 543 (7th Cir. 2011)); *see also Gupta v. Melloh*, no. 19-2723, at *7 (7th Cir. Dec. 6, 2021) (slip op.) ("Taking the facts in the light most favorable to the non-moving party does not mean that the facts must come only from the non-moving party. Sometimes the facts taken in the light most favorable to the non-moving party come from the party moving for summary judgment or from other sources.").

## II. BACKGROUND

### A. The Amended Complaint

Mr. Sloan is proceeding on Eighth Amendment medical claims against Dr. Samuel Byrd, Dr. Benny Seto, and Wexford of Indiana, LLC. He claims the defendants were deliberately indifferent in treating his broken hand. He alleges that Dr. Seto performed an unnecessary hand surgery to avoid filling out paperwork, that Dr. Byrd failed to manage his pain and nerve damage after the injury and during post-operative care, and that Wexford has a policy or widespread practice of delaying necessary medical care. Dkt. 26, pp. 2-4 (screening order); dkt. 27, pp. 4-6 (amended complaint).

### B. Designated Evidence

#### 1. Injury and Recommendation for Surgery

On June 13, 2017, Mr. Sloan injured his left hand playing basketball at Wabash Valley Correctional Facility. Dkt. 70-1, para. 4 (Byrd Affidavit). He was seen by the facility's medical staff that same day. *Id.* Dr. Byrd ordered a hand x-ray, an immediate Toradol injection, and tramadol for pain relief. *Id.* The x-ray showed that the bone in Mr. Sloan's hand that attaches to his left middle finger was completely broken at an angle. *Id.* at para. 5. In medical terms, this type of break is called "a displaced oblique fracture of the third metacarpal." *Id.* Based on this hand x-ray, Dr. Byrd told the nursing staff to submit a request for an urgent consultation with an orthopedic specialist. *Id.*

Mr. Sloan saw Dr. Seto six days later on June 19. *Id.* at para. 6. Dr. Seto requested approval for hand surgery from Wabash Valley Correctional Facility. *Id.*; dkt. 75-3, p. 19 (medical records). Dr. Byrd submitted a request for surgical approval two days later on June 21. Dkt. 70-1, para. 6. Wabash Valley Correctional Facility contacted an outpatient surgical center to schedule the surgery sixteen days later on July 7, and the surgery was scheduled for August 14, 2017. *Id.* at paras. 7-8. This surgery date was not selected by Dr. Byrd, Wexford, or Dr. Seto. *Id.* at para. 9; dkt. 75-1, para. 11 (Seto Affidavit).

#### 2. Pain Management Prior to Surgery

Before his surgery, Mr. Sloan submitted several Request for Healthcare forms stating that he was in significant pain and needed additional pain medication. Dkt. 75-4, pp. 1-3. On June 20, he stated that he was in "A LOT" of pain and that he was out of tramadol. *Id.* at 1. In response, the medical staff wrote, "Med. order entered for tramadol 3x daily." *Id.* On July 5, he reiterated this complaint, saying that he was in a lot of pain, that nothing was being done for it, and that he had

3

run out of pain medication. *Id.* at 2. In response, the medical staff wrote, "Dr. Byrd has sent a request to renew T3's," meaning that Dr. Byrd had renewed Mr. Sloan's prescription for tramadol three times daily. *Id.* On July 11, Mr. Sloan again said that he was in "a great deal of pain" and that his prescription for pain medication had run out. *Id.* at 3 (emphasis in original). In response, the medical staff wrote, "approved and scheduled for surgery. Order for Ultram." *Id.*[1]

On July 31, Dr. Byrd increased Mr. Sloan's tramadol prescription from one 50 mg tablet three times daily to two 50 mg tablets three times daily. Dkt. 70-1, para. 12; dkt. 70-2, pp. 107-08. The next day, Mr. Sloan submitted a Request for Health Care form stating that he had not received this increase in medication. *Id.* at 7. In response, the medical staff wrote, "Noted." *Id.*

At his deposition, Mr. Sloan testified that the pain in his hand increased from his initial appointment with Dr. Seto in June until his surgery on August 14. Dkt. 75-5, pp. 31-32. The pain was worse at night, and he could not use his hand at all, despite receiving pain medication and wearing a splint. Dkt. 75-5, pp. 31-32.

### 3. First Surgery and Informed Consent

Dr. Seto performed surgery on Mr. Sloan's left hand at an outpatient surgical center on August 14, 2017. Dkt. 75-1, para. 12. Prior to the surgery, Dr. Seto examined Mr. Sloan to reassess his pain and range of motion. *Id.* at para. 15. Dr. Seto told Mr. Sloan that, in his medical opinion, the surgery would not have been necessary unless Mr. Sloan was still experiencing significant pain and limited range of motion. *Id.* Mr. Sloan told Dr. Seto that he still had pain and was not moving his finger well. *Id.* at para. 14. Mr. Sloan also told a nurse that he was in acute, constant pain that was worse with movement. Dkt. 75-3, p. 163; dkt. 75-5, pp. 119-120.

---

[1] Ultram is the brand name for tramadol.

Dr. Seto told Mr. Sloan before the surgery that there were no guarantees that the surgery would be effective and that it could do more harm than good. Dkt. 75-5, p. 114. After Dr. Seto informed Mr. Sloan of the benefits, risks, and alternative treatment options, Mr. Sloan did not have any further questions. Dkt. 75-3, p. 138. Mr. Sloan signed a written consent for surgery form before Dr. Seto performed the procedure. Dkt. 75-3, p. 137.

Mr. Sloan testified that he believed if he had refused the surgery, he never would have been treated again for his broken hand. *Id.* at 43. Thus, although Mr. Sloan understood that he had a choice to refuse the surgery, as a practical matter, he did not believe that this was a meaningful choice because he believed that declining the surgery would have ended his medical care altogether. *Id.* Mr. Sloan has designated no evidence showing that he expressed these concerns to Dr. Seto before undergoing surgery.

### 4. Post-Surgical Care

Mr. Sloan returned to Wabash Valley Correctional Facility on August 14. Dr. Seto had recommended a Norco prescription to manage his pain, which Dr. Byrd approved and Mr. Sloan received. Dkt. 70-1, para. 14; dkt. 70-2, p. 102.

On August 21, Dr. Byrd saw Mr. Sloan and continued his medications for Norco, tramadol, and Neurontin. *Id.* at para. 15; dkt. 70-2, pp. 95-97.

On August 28, Mr. Sloan had a follow-up appointment with Dr. Seto. *Id.* at para 16; dkt. 75-1, para. 18. Dr. Seto removed the pins in his hand and indicated that the bone showed signs of routine healing. Dkt. 70-1, para. 16. On August 30, Dr. Byrd continued Mr. Sloan's Norco prescription and submitted a request for another follow-up appointment with Dr. Seto in two weeks. *Id.*; dkt. 70-2, pp. 83-87.

On August 30, Dr. Byrd saw Mr. Sloan and learned that he was not receiving his Norco prescription and was in tremendous pain. *Id.* at para. 17. Dr. Byrd directed the nursing staff to continue providing Mr. Sloan with Norco, as this medication had been approved by Wexford's regional medical director. *Id.*

On September 8, Mr. Sloan had a second follow-up appointment with Dr. Seto. *Id.* at para. 18; dkt. 75-1, para. 18. His cast was removed and replaced with a splint. Dkt. 70-1, para. 18. Dr. Seto recommended a course of physical therapy. *Id.*

On October 17, Mr. Sloan had a third follow-up appointment with Dr. Seto. *Id.* at para. 21; dkt. 75-1, para. 18. Mr. Sloan reported numbness and tingling in his hand. Dkt. 75-1, para. 18. Dr. Seto recommended an EMG, which is a technique for evaluating and recording electrical activity in the skeletal muscles. *Id.* Dr. Byrd had discussed the request for an EMG with Wexford's regional medical director, who denied the request and recommended reassessing the need for an EMG after three months of anti-inflammatory medication. Dkt. 70-1, para. 23.

On October 18, Dr. Byrd saw Mr. Sloan and continued his prescriptions for Norco and tramadol. Dkt. 70-1, para. 21.

On October 19, Mr. Sloan had a physical therapy appointment and received a home exercise plan for his broken hand. *Id.* at para. 22.

On November 29, Dr. Byrd saw Mr. Sloan for a chronic care appointment. Mr. Sloan stated that he was still experiencing pain in his left hand. Given Mr. Sloan's persistent pain, and the risk of dependence from long-term use of tramadol, Dr. Byrd discontinued tramadol; he ordered Tylenol and Mobic and continued his prescription for Neurontin. *Id.*; dkt. 70-2, pp. 60-64.

On January 12, 2018, during a visit with Dr. Byrd, Mr. Sloan reported burning and tingling in his left hand. *Id.* at para. 23; dkt. 70-2, pp. 55-58. Because of these continued carpal tunnel symptoms, Dr. Byrd submitted a second request for an EMG to the regional medical director. *Id.*

On March 7, Mr. Sloan received an EMG, which revealed moderate-to-severe carpal tunnel syndrome in Mr. Sloan's left hand. *Id.* at para. 27; dkt. 70-2, p. 53.

### 5. Second Surgery

On May 2, Mr. Sloan had an offsite appointment with Dr. Seto regarding his diagnosis for carpal tunnel syndrome. Dkt. 70-1, para. 29; dkt. 75-1, para. 19. Dr. Seto recommended carpal tunnel decompression surgery of the left wrist and instructed Mr. Sloan to perform passive range of motion exercises. *Id.* Mr. Sloan chose to undergo this surgery. Dkt. 75-1, para. 19.

On May 8, Dr. Byrd submitted a request for decompression surgery based on Dr. Seto's recommendation. Dkt. 70-1, para. 30.

On May 11, Dr. Byrd met with Mr. Sloan and discussed pain management. *Id.* at para. 31; dkt. 70-2, pp. 31-34. Mr. Sloan told Dr. Byrd that his prescription for Trileptal, an antiseizure medication, was ineffective. *Id.* In response, Dr. Byrd prescribed Cymbalta, Tylenol, and capsaicin cream. *Id.*

On August 16, Dr. Seto performed carpal tunnel decompression surgery. *Id.* at para. 33; dkt. 75-1, para. 19. There were no complications. *Id.*

### 6. Dr. Seto's Medical Expert

Dr. Seto has designated Dr. Thomas Kiefhaber, a board-certified orthopedic surgeon, as an expert witness. Dr. Kiefhaber's opinion is that Dr. Seto exercised acceptable medical judgment in caring for Mr. Sloan's broken hand and carpal tunnel syndrome. Dkt. 75-6, p. 2, para. 1.

Dr. Seto states that his treatment decisions were based on his education, experience, and professional medical judgment. Dkt. 75-1, para. 20.

### III. DISCUSSION

#### A. Deliberate Indifference Standard

At all times relevant to his claims, Mr. Sloan was a convicted offender. Accordingly, his medical treatment is evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

"To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotations omitted).

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 F. App'x 861, 862 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence

8

suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Dr. Seto

In the amended complaint, Mr. Sloan alleges that Dr. Seto performed an unnecessary surgery in order to avoid completing paperwork. Dkt. 27, p. 4. The evidence does not support this allegation. To the contrary, the evidence shows that Dr. Seto recommended surgery during the appointment on June 19, 2017. Dkt. 75-3, p. 19. He evaluated Mr. Sloan prior to performing surgery on August 14. Dkt. 75-1, para. 15. At that time, Dr. Seto told Mr. Sloan that he would only recommend surgery if he still had significant pain and limited range of motion as a result of the broken hand. *Id.* Mr. Sloan told Dr. Seto and the nursing staff that he had near constant pain and had trouble using his hand. Dkt. 75-3, p. 163. Dr. Seto then informed Mr. Sloan of the risks, benefits, and alternative treatment options, and Mr. Sloan elected to undergo surgery. Dkt. 75-3, p. 138.

Mr. Sloan has designated no evidence that he expressed his fears that refusing the surgery carried additional risks for the ability to obtain treatment in the future. Moreover, Dr. Seto was not responsible for the ultimate decisions surrounding Mr. Sloan's access to medical care. Dr. Seto was only an outside physician who had been contracted to provide specialized medical care

for Mr. Sloan's broken hand and carpal tunnel syndrome. Dkt. 75-1, para. 20. He did not provide treatment at the facility or hold a supervisory position for Wexford. *Id.*

Dr. Seto states that he made all treatment decisions based on his professional medical judgment. Dkt. 75-1, para. 20. His expert witness, Dr. Kiefhaber, has opined that Dr. Seto's treatment of Mr. Sloan was acceptable. Dkt. 75-6, p. 2, para. 1. Nothing in the record suggests that Dr. Seto's treatment decisions were based on anything other than his professional medical judgment. *Norfleet*, 439 F.3d at 396. Given this uncontradicted evidence, and the deference courts give to a physician's medical decisions in the Eighth Amendment context, no reasonable factfinder could conclude that Dr. Seto was deliberately indifferent to Mr. Sloan's serious medical need. Accordingly, Dr. Seto's motion for summary judgment is **GRANTED**.[2]

### C.  Dr. Byrd

Mr. Sloan alleges that he repeatedly told Dr. Byrd about the pain in his right hand, but that Dr. Byrd merely treated his pain with an antiseizure medication that he knew was ineffective. Dkt. 27, p. 5. He also alleges that Dr. Byrd refused to give him a nerve medication that had been recommended by Dr. Seto. *Id.*

Neither of these allegations is supported by designated evidence. Dr. Byrd states that he prescribed Mr. Sloan Toradol, tramadol, Tylenol, Mobic, Norco, Cymbalta, and capsaicin cream to treat the pain in hand. Dkt. 70-1, paras. 4, 12, 15, 17, 21, 31. Dr. Byrd even increased Mr. Sloan's daily dosage of tramadol (from 50 mg three times a day to 100 mg three times a day) in response to his complaints of increased pain before his first surgery in August 2017. *Id.* at para. 12. When he learned that the nursing staff had temporarily failed to administer Norco as part of Mr. Sloan's post-surgical care, he directed the nursing staff to resume this medication, as it had been approved

---

[2] The Court therefore does not address Dr. Seto's argument that he was not acting under color of state law for § 1983 purposes.

by the regional medical director. *Id.* at para. 17. When Mr. Sloan told Dr. Byrd that the antiseizure medication (Trileptal) was ineffective, Dr. Byrd discontinued this medication and prescribed Cymbalta, Tylenol, and capsaicin cream. *Id.* at para. 31. Dr. Byrd also states that he prescribed Neurontin, which is a nerve medication, after Mr. Sloan began experiencing symptoms of carpal tunnel syndrome. *Id.* at para. 22. Dr. Byrd's statements are corroborated by Mr. Sloan's medical records. Dkt. 70-2, pp. 53, 55-58, 60-64, 83-87, 95-97, 102.

Although Dr. Byrd discontinued Mr. Sloan's tramadol prescription after five months, this was done because of Mr. Sloan's persistent pain and tramadol's high potential for addiction. Dkt. 70-1, para. 22. Dr. Byrd continued Mr. Sloan on other pain medications, such as Neurontin, and Tylenol, and Mobic. *Id.* The Seventh Circuit has held that a medical professional's concern that a prisoner will become addicted to a high-strength pain medication may justify removing the prisoner from that medication in favor of less addictive alternatives. *See Lockett v. Bonson*, 937 F.3d 1016, 1024-25 (7th Cir. 2019) (affirming summary judgment in favor of nurse practitioner who discontinued prisoner's prescription for a strong opioid painkiller in favor of a weaker painkiller to treat pain associated with sickle cell anemia).

There is no evidence that Dr. Byrd was deliberately indifferent to Mr. Sloan's serious medical need in the treatment of his broken hand or carpel tunnel syndrome. Accordingly, Dr. Byrd's motion for summary judgment is **GRANTED**.

**D.  Wexford**

Mr. Sloan alleges that the medical staff at his facility routinely delays necessary medical treatment, and that these delays aggravated the injuries to his hand. Dkt. 27, p. 5. The Court has interpreted these allegations as a claim alleging that Wexford maintains an unlawful policy or widespread practice or custom of unnecessarily delaying medical care. Dkt. 26, p. 4; *see also*

*Simpson v. Brown County*, 860 F.3d 1001, 1005-06 (7th Cir. 2017) (holding that a corporation acting under color of state law "cannot be held liable for damages under 42 U.S.C. § 1983 on a theory of *respondeat superior*, but that it can, "be held liable for unconstitutional policies or customs") (cleaned up) (citing *Monell v. Dep't of Social Services*, 436 U.S. 658, 690-91 (1978)).

There is no evidence that Wexford maintains an express policy of delaying medical care for prisoners at Mr. Sloan's facility. To the extent that Mr. Sloan experienced unnecessary delays in the treatment of his broken hand and carpal tunnel syndrome, his own experience of delayed medical care, without more, does not establish a widespread practice or custom for purposes of the Eighth Amendment. *See Hildreth v. Butler*, 960 F.3d 420, 426 (7th Cir. 2020) (prisoner failed to establish that Wexford had a practice of delaying prescriptions; the evidence failed to show that the incidents of delayed prescriptions were widespread, as they only involved the plaintiff, or that the incidents were sufficiently numerous, as there were only three instances of delays). Accordingly, Wexford's motion for summary judgment is **GRANTED**.

    **E.  Physical Therapy**

In the amended complaint, Mr. Sloan states that his physical therapy was discontinued after one session and that the pamphlets he received for at-home physical therapy were confiscated. Dkt. 27, p. 5. The complaint does not allege than any of the defendants were personally involved in the decision to discontinue his physical therapy or in the confiscation of his pamphlets. For clarity and completeness of the record, the Court notes that the evidence does not show that any of the defendants were personally involved in this action, and as such, they may not be held liable for the decision to discontinue Mr. Sloan's physical therapy or the decision to confiscate his physical therapy pamphlets. *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017)

("Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation.") (cleaned up).

## IV. CONCLUSION

The defendants' motions for summary judgment, dkts. [68] and [74], are **GRANTED**. This case is now **DISMISSED**. Final judgment in accordance with this Order shall now issue.

**SO ORDERED**.

Date: 2/18/2022

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

ROGER SLOAN
910908
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111
CARLISLE, IN 47838

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

William W. Drummy
WILKINSON GOELLER MODESITT WILKINSON & DRUMMY
wwdrummy@wilkinsonlaw.com

Rachel D. Johnson
KATZ  KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com

Holly A Reedy
WILKINSON GOELLER MODESITT WILKINSON & DRUMMY
hareedy@wilkinsonlaw.com